# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

FLORENCE STEWART

VERSUS

FAMILY DOLLAR, INC., ET AL.

CIVIL ACTION

NO. 23-314-JWD-EWD

## RULING AND ORDER

This matter comes before the Court on *Defendants' Joint Motion for Summary Judgment* (Doc. 115) ("*Motion*" or "*MSJ*") filed by defendants Family Dollar, Inc., Family Dollar Stores of Louisiana, LLC (collectively, "Family Dollar"), Southern Development of Mississippi, Inc. ("Southern" or "SDM"), and Ferrellgas, LP d/b/a Blue Rhino ("Ferrellgas"). Plaintiff Florence Stewart ("Plaintiff" or "Stewart") opposes the motion. (Doc. 117.) Defendants filed a reply. (Doc. 122.) Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, the *Motion* is denied.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This case arises from a March 4, 2022, fall allegedly suffered by Plaintiff Florence Stewart in front of the Family Dollar Store in Jackson, La. (*Statement of Material Facts* ("*SMF*"), Doc. 115-2 at ¶¶ 1–3)[1]; Doc. 79-1 at 1; Doc. 8 at 1.) Plaintiff alleges that she "was walking on the store sidewalk to dispose of garbage. The trash receptacle was located next to the [Ferrellgas] propane tank cage. After throwing away her trash, Ms. Stewart walked back to her car and tripped and fell due to an over-exposed and over-protruding nut and bolt." (Doc. 35 at 3–4, ¶ 12.) The bolt was one of eight securing one of two yellow bollards installed on the walkway in front of the propane

---

[1] Unless otherwise indicated, when the Court cites to the *SMF* in support of a fact, that fact has been admitted by Plaintiff. *See* M.D. La. Civ. R. 56(f).

tank cage or kiosk as a "vehicle crash protection system[.]" (*Id.* at 3, ¶ 11; *see also* photographs, Doc. 115-4 at 18–22.[2]) The propane kiosk and trash receptacle were in front of the Family Dollar store.

Plaintiff sued Family Dollar and Southern in state court (Doc. 1-4 at 4–6) and the matter was removed to this Court (Doc. 1). After the case was removed, Family Dollar filed a cross claim against Southern (Doc. 20) and a third-party complaint against Ferrellgas (Doc. 21). Plaintiff filed an amended complaint, in which he sued Family Dollar, Southern, and Ferrellgas. (Doc. 35.) The case is set for trial January 12, 2026.

Southern was "the owner/lessor of the premises," including the sidewalk where the accident happened. (Doc. 115-1 at 1.) Family Dollar was "the store lessee and operator[.]" (*Id.*; *see also* Doc. 104-4, lease agreement between Southern and Family Dollar.) The kiosk and bollards had been placed there by Ferrellgas pursuant to a written contract between Family Dollar and Ferrellgas. (Doc. 104-1 at 1, # 6; Doc. 108-1 at 1, # 6; Doc. 109-1 at 1, # 6.)

Plaintiff asserts claims against all defendants pursuant to Louisiana Civil Code articles 2315, 2316, 2317. (Doc. 35 at ¶¶ 14–15, 19–20, 23–24.) She also asserts an alternative claim against Family Dollar under Louisiana Revised Statutes § 9:2800.6 for merchant's liability (*Id.* at ¶ 16) and against Southern under Louisiana Revised Statutes § 9:3221 as the owner of leased premises (*Id.* at ¶ 29).

## II. PARTIES' ARGUMENTS

### A. Defendants' *MSJ* (Doc. 115)

Defendants argue that there is no genuine issue of material fact as to how the unwitnessed fall occurred (Doc. 115-1 at 2); there are photographs depicting the condition of the bollard and

---

[2] Plaintiff admits that these photographs accurately depict the bolts and bollards. (Doc. 115-2 at 1; Doc. 117-1 at 1.)

fasteners on the day of the incident (*id.* (citing Doc. 115-4 at 7, 12, 19, 21–22)), and there is no dispute as to the physical characteristics of same (*id.* (citing Doc. 57-4 at 2–3 ¶¶ 15, 21)). The bollard is welded to a metal base, 12 inches square and 1/2 inch high, secured by four bolts. (*Id.* (citing Doc. 57-4 at 2 ¶ 15).) Defendants agree with Plaintiff's expert Joseph Barnes ("Barnes") that "[t]he exposed portion of the bolt Stewart tripped over was measured . . . as standing 1 1/4 inch above the base of the bollard." (*Id.* (citing Doc. 57-4 at 3 ¶ 21).) The "bollard consists of a vertical pole, 20 inches high[.]" (*Id.*)

> Defendants argue summary judgment is appropriate because
>
> the allegedly dangerous conditions on which Plaintiff's claims are based (*i.e.*, the bollards and bolts) have been found not to be unreasonably dangerous by Louisiana courts; (2) the bollards and bolts are open and obvious; and (3) the utility of the bollards and bolts greatly outweighs any danger posed by their installation.

(*Id.* at 3 (emphasis omitted).)

Defendants agree that the owner or custodian of property has a duty to keep the property in a "reasonably safe condition[]" and a duty to "discover any unreasonably dangerous condition . . . and either correct the condition or warn potential victims of the [condition's] existence." (*Id.* at 3–4 (quoting *Farrell v. Circle K Stores, Inc.*, 22-0849 (La. 3/17/23), 359 So. 3d 467, 473–74) (internal quotation marks omitted)).) However, summary judgment " 'can be used to determine whether a defect constitutes an unreasonably dangerous condition[.]' " (*Id.* at 4 (quoting *Farrell*, 359 So. 3d at 476).) The determination of whether a party has breached a duty owed is made by looking to four factors:

> 1) the utility of the complained-of condition;
> 2) the likelihood and magnitude of harm, including the obviousness and apparentness of the condition;
> 3) the cost of preventing the harm; and,
> 4) the nature of the plaintiff's activities in terms of social utility or whether the activities were dangerous by nature.

(*Id.*)

Defendants argue the Court must assess "whether the condition was intended, or present by design[]" to determine "the utility of the complained of condition[.]" (*Id.*) Here, Defendants say the bollards were intentionally installed for "the purpose of safety and Code compliance." (*Id.* at 5 (citing Doc. 115-5).) The utility of the bollards "cannot be understated[]" because otherwise there would be an increased risk of a catastrophic explosion through the increased risk of a vehicle "crashing into the propane tank display[.]" (*Id.* at 5.) Under a balancing test, this factor should "weigh against a finding that the premises was unsafe." (*Id.* at 4.)

Defendants contend that the second factor is an assessment of "the degree to which the condition will likely cause harm." (*Id.* at 5.) As to the third factor, Defendants argue that, similar to *Farrell*, "[t]he cost of preventing the harm was not considered . . . due to a lack of evidence[.]" (*Id.*) Defendants contend that the final factor—"the nature of [Plaintiff's] activities in terms of social utility, or whether the activities were dangerous by nature[]"—entails considering "if [Plaintiff's] activity ha[d] utility or [was] inherently dangerous." (*Id.*)

Defendants argue Louisiana jurisprudence establishes that the bolt cannot be found unreasonably dangerous due to height deviation. (*Id.*) Defendants anticipate Plaintiff will argue that "the bolt was unreasonably dangerous because it protruded more than 1/4" from the sidewalk." (*Id.* (citing Doc. 79-2 at 8; Doc. 79-3 at 20).) Defendants point to this Court's recognition that "Louisiana courts have repeatedly held that elevations of up to two inches do not present an unreasonable risk of harm." (*Id.* (quoting *Lacaze v. Walmart Stores, Inc.*, 20-696, 2022 WL 4227240, at *4 (M.D. La. Sept. 13, 2022) (deGravelles, J.)).) The Louisiana Supreme Court, applying a risk-utility balancing test, did not find a height deviation of 1 1/4" to 1 1/2" to present an unreasonable risk of harm because the deviation was "readily observable[.]" (*Id.* at 5–6 (quoting

*Chambers v. Vill. of Moreauville*, 11-898 (La. 1/24/12), 85 So. 3d 593, 602) (internal quotation marks omitted).) Defendants argue that this conclusion was reached through adherence to previous jurisprudence, noting that "pavement irregularities or defects . . . are not unreasonably dangerous when properly analyzed under the risk[-]utility balancing test." (*Id.* at 6 (citing *Boyle v. Bd. of Supervisors, LSU*, 96-1158 (La. 1/14/97), 685 So. 2d 1080; *Reed v. Wal-Mart Stores, Inc.*, 97-1174 (La. 3/4/98), 708 So. 2d 362).)

Even if the bollard/bolts are found not to comply with industry guidelines, Defendants say this would not give rise to an unreasonably dangerous condition. (*Id.* at 6 (citing *Eskine v. City of Gretna*, 17-542 (La. App. 5 Cir. 3/14/18), 240 So. 3d 338, 340–41).) Plaintiff has argued that because "the sidewalk on which the bollards were located left less than 36 [inches] of walking space between the edge of the plates securing the bollards and the edge of the sidewalk/beginning of the parking lot[,]" the bollards and bolts were unreasonably dangerous. (*Id.*) Defendants respond that, even taking this argument as true, this Court cannot find Defendants liable, as Louisiana jurisprudence has previously "granted summary judgment in favor of a defendant despite evidence the walkway on which the plaintiff allegedly fell was narrower than the 48 [inches] required by the Gretna Code of Ordinances." (*Id.* (citing *Eskine*, 240 So. 3d at 340–41).)

Plaintiff argues that an unreasonably dangerous condition exists because Defendants did not comply with standards set forth by the Occupational Safety and Health Administration ("OSHA"). (*Id.*) Defendants assert that this too would not foreclose summary judgment because " 'OSHA is a regulatory provision enforced by fines or criminal prosecutions' and 'does not create a private right of action.' " (*Id.* at 7 (quoting *Bates v. E.D. Bullard Co.*, 11-187 (La. App. 3 Cir. 10/5/11), 76 So. 3d 111, 115).) This conclusion can be extended to other non-OSHA standards Plaintiff may raise, such as ADA Accessibility guidelines, National Fire Protection Association

("NFPA") guidelines, American National Standards Institute ("ANSI") recommendations, and Advancing Standards Transforming Markets ("ATSM") recommendations. (*Id.*) Since mandatory OSHA regulations do not give rise to a duty, this would also foreclose any duty required under ADA Accessibility Guidelines, and this "certainly" extend to recommended guidelines under the NFPA, ANSI, and ASTM. (*Id.*)

Defendants also point to this Court's precedent, arguing that failure to comply with ADA and/or OSHA standards was not previously enough to find an unreasonably dangerous condition under Louisiana Revised Statutes § 9:2800.6, absent evidence to establish the standards apply to the shopper. (*Id.* (citing *Lacaze*, 2022 WL 4227240, at *9).) Finally, Defendants point to a case establishing that this Court can grant their motion despite expert testimony indicating the standards and guidelines were violated. (*Id.* (citing *Primeaux v. Best W. Plus Houma Inn*, 18-841, p. 10 (La. App. 1 Cir. 2/28/19), 274 So. 3d 20, 29–30).)

Next Defendants argue that it is well established "that a defendant generally does not have a duty to protect against that which is 'obvious and apparent.'" (*Id.* at 8 (quoting *MacArthur v. Penn Nat'l Gaming, Inc.*, 22-434, p. 1 (La. App. 1 Cir. 10/3/22), 2022 WL 5140951, at *1 (citing *Bufkin v. Felipe's La., LLC*, 14-288 (La. 10/15/14), 171 So. 3d 851, 856)).) "When a risk is open and obvious, the probability of injury is low[.]" (*Id.* (quoting *Hammonds v. Reliance Ins. Co.*, 06-529 (La. App. 1 Cir. 12/28/06), 2006 WL 3813689, at *2) (internal quotation marks omitted).) Defendants argue that open and obvious "means that 'the risk of harm should be apparent to all who encounter the dangerous condition.'" (*Id.* (quoting *Boyce v. CUSA, LLC*, No. 18-157, 2019 WL 576010, at *3 (W.D. La. Feb. 12, 2019) (Doughty, J.)).) Defendants also argue that under Louisiana law, Plaintiff had "a duty to see that which should be seen and is bound to observe [her] course to see if [her] pathway is clear." (*Id.* (quoting *MacArthur*, 2022 WL 5140951, at *1) (citing

6

*Dickson v. City of Shreveport*, 47,268 (La. App. 2 Cir. 8/8/12), 104 So. 3d 9, 9–10, *writ denied*, 12-2284 (La. 11/30/12), 103 So. 3d 375)) (internal quotation marks omitted).)

      Defendants then point to previous decisions reached by Louisiana courts that they contend are relevant to the current case. (*Id.* at 8–9.) They point to this Court's ruling finding an allegedly dangerous condition "open and obvious because it was painted yellow[,]" a color different from the surrounding area, and something Plaintiff could have seen had Plaintiff "been looking down." (*Id.* (citing *Allen v. MC Offshore Petroleum, LLC*, 13-CV-48, 2015 WL 1757834, at *6–7 (M.D. La. Aug. 19, 2015) (Dick, J.)).)

      Defendants cite *Creager v. Marrero Land & Improvement Ass'n Ltd.*, 21-322, pp. 6–7 (La. App. 5 Cir. 2/23/22), 362 So. 3d 696, 702, where the Louisiana Fifth Circuit Court of Appeal found a curb painted red, "the condition at issue[,]" was open and obvious when the plaintiff "was not watching where she stepped," where "there were no obstacles blocking her path[,]" and where Plaintiff had " 'observed and traversed the [condition at issue] on numerous occasions' before and after the fall at issue." (*Id.* at 9.) Defendants also cite *Bice v. Home Depot U.S.A., Inc.*, 16-447 (La. App. 1 Cir. 12/22/16), 210 So. 3d 315, a case which they contend found that a bollard that was painted black and blended in with surrounding appliances was open and obvious because it "was in a well-lit area that was easily observable and obvious to all customers[,]" the store "had no knowledge of any incidents of trips or falls in [the] area of the store within five years of [the] incident[,]" and the fall would not have occurred "but for [Plaintiff's] own inattentiveness." (*Id.* (quoting *Bice*, 210 So. 3d at 320) (internal quotation marks omitted).) Defendants also point to *Bice* to say "that any risk [the bollard posed] was outweighed by the utility of the bollards[.]" (*Id.* (citing *Bice*, 210 So. 3d at 319–20).)

Defendants urge that because this case is similar to the above cases, it requires that the Court grant summary judgment. Defendants support this contention by pointing to the "prominently displayed and painted bright yellow[]" bollards that "Plaintiff had seen . . . before and knew . . . were there." (*Id.* at 9–10 (citing Doc. 54-3 at 4, 11, 16–18).) Plaintiff testified "that she parked in the same spot every time she went to the store[,]" and "that she might have seen the bolts 'if [she] [were] looking[.]' " (*Id.* (quoting Doc. 54-3 at 14).) Finally, Family Dollar had "no knowledge of any similar incidents" to that of Plaintiff's fall. (*Id.* at 10 (citing Doc. 54-6).)

Defendants point the Court to other cases involving conditions which they allege were similar to the one in question that were found to be open and obvious (*Id.* at 10), including one finding a sprinkler head open and obvious in part because the curb was "painted bright yellow" (*id.* (quoting *Badeaux v. Louisiana-I Gaming*, 22-30129, 2023 WL 334783, at *2 (5th Cir. Jan. 20, 2023)); one finding a "large red post" open and obvious (*id.* (quoting *Guttry v. Costco Wholesale Corp.*, 22-183, p. 8 (La. App. 3 Cir. 10/26/22), 352 So. 3d 1047, 1051)); one finding a "sunken water meter" open and obvious because it "was placed less than a foot away from the driveway with posts near it" (*id.* (quoting *Hammonds*, 2006 WL 3813689, at *2)); one "finding that [a] curb did not present an unreasonable risk of harm because it was 'painted yellow' and was 'clearly visible to approaching pedestrians exercising reasonable care' " (*id.* (quoting *Primeaux*, 274 So. 3d at 30)); and one finding yellow blocks open and obvious where "plaintiff was not walking 'with her head down' " (*id.* (quoting *Vasseur v. Piggly Wiggly Stores, Inc.*, 07-888, 2007 WL 4248621, at *1 (La. App. 3 Cir. 12/5/07)).

Defendants argue that this case "is a classic example of an inattentive Plaintiff tripping over an open and obvious object." (*Id.*) Plaintiff "would have seen the bollard 'had she paid even cursory attention to the pathway ahead of her.' " (*Id.* (quoting *Dickson*, 104 So. 3d at 10).)

Defendants dismiss Plaintiff's argument "that the reason [Plaintiff] tripped on the bolt was [because] it was slightly taller than the other bolts securing the bollard" as an argument that "defies common sense." (*Id.* at 10–11 (citing Doc. 115-4 at 18–19, 22).) "It should be 'apparent to all who encounter' the bollard and bolt that stepping on the bolt would present a risk of harm, regardless of its height." (*Id.* (citing *Boyce*, 2019 WL 576010, at *3) (emphasis omitted).) In addition, the base of the bollard "contrast[s] with the pavement[]" such that Plaintiff should have seen and not stepped on the bolt. (*Id.*) Therefore, summary judgment should be granted because Plaintiff knew the bright yellow bollard was there and fell because she was not paying attention. (*Id.*)

Defendants contend that *Farrell* and post-*Farrell* decisions also support granting summary judgment here. (*Id.* at 12–14, (citing *Bertrand v. Jefferson Arms Apartments, LLC*, 22-1195 (La. App. 1 Cir. 4/1/4/23), 366 So. 3d 595; *Mentel v. Margavio*, 21-739 (La. App. 5 Cir. 11/16/22), 353 So. 3d 312; *Wilson v. Dollar Tree Stores, Inc.*, 23-1019, 2024 WL 323402 (La. App. 1 Cir. 1/29/24); *Jones v. Kroger Co.*, No. 23-83, 2024 WL 386956 (W.D. La. Jan. 31, 2024)).) Defendants also point the Court to cases which they contend recognize a pedestrian's duty to observe their path and exercise care to ensure their pathway is clear. (*Id.* (citing *Betrand*, 366 So. 3d 596; *Wilson*, 2024 WL 323402; *Jones*, 2024 WL 386956).) Additionally, Defendants cite jurisprudence where a plaintiff's knowledge of the condition was found to weigh in favor of granting summary judgment. (*Id.* at 14 (citing *Jones*, 2024 WL 386956).)

Defendants argue that *Klumpp v. Ochsner Clinic Found.*, 24-175 (La. App. 5 Cir. 12/18/24), 410 So. 3d 315, is similar to the present case. "A pedestrian tripped and fell over the base of a handicap sign placed in and encroaching upon a sidewalk." (*Id.* at 13 (citing *Klumpp*, 410 So. 3d at 318).) Because the condition was open and obvious, with no other reported accidents, summary judgment was granted in favor of the defendant. (*Id.* (citing *Klumpp*, 410 So. 3d at 322,

9

324).) Defendants highlight the court's granting summary judgment in favor of the defendant despite the condition "arguably violat[ing] building codes, and [] the cost of moving it to a different location was reasonable[.]" (*Id.* (citing *Klumpp*, 410 So. 3d at 320, 322–23).) The aforementioned factors "did not outweigh the more significant factors in the risk/utility balancing test." (*Id.* (citing *Klumpp*, 410 So. 3d at 323).)

Defendants argue the "legal analysis of whether a condition is unreasonably dangerous is the same[] under the merchant liability statute (La. RS 9:2800.6) or under Louisiana Civil Code Article 2317.1[.]" (*Id.* at 14.)

In reviewing the risk-utility balancing test in the context of the specific facts of this case, Defendants contend the condition at issue had utility. (*Id.*) The bollards protected the propane tank cage. (*Id.* (citing photographs, Doc. 115-4 at 18–22).) The bollard was placed "in order to achieve compliance with safety regulations, and thereby reduce the possibility of a propane-fueled conflagration." (*Id.* (citing La. Admin. Code tit. 55, § IX-181(A) (2020)).) The bollard was built in compliance with requirements that the "crash protection must be metal at least two inches in diameter, must stand twenty inches above ground level, and be at least two feet from the cage and no more than four feet apart." (*Id.* (citing La. Admin. Code tit. 55, § IX-181(E)(4)(b) (2020); Doc. 115-4 at 18–22).)

Additionally, Defendants argue, "[t]he use of bolts to secure such bollards to a preexisting cement sidewalk" is "customary and the standard within the industry." (*Id.* (citing affidavit of Ferrellgas' Safety Manager John McLeod, Doc. 115-5 at 1 ¶ 2).) Under the risk-utility balancing test, the utility "strongly weighs in [Defendants'] favor . . . [,]" because without the bolts "securing the bollards to the ground[,]" the bollards would not be sufficiently immobile such that the propane

10

tanks would be safe from an automobile crash. (*Id.* at 15.) Defendants contend that the utility of the bollards and bolt weigh in their favor under the risk-utility balancing test. (*Id.*)

Defendants next argue that because the bollards were open and obvious, an analysis of the likelihood and magnitude of the harm should weigh in favor of granting Defendants' *Motion*. (*Id.*) The bollards were "plainly visible." (*Id.*) "[E]ven the areas which have weathered and lost their yellow paint . . . contrast with the cement pavement, making them readily apparent to any pedestrian traversing the area." (*Id.*) A casual look at each bollard would reveal an irregular surface not intended to be walked on, such that a pedestrian would have to step so close as to nearly step on the bollard in order to make contact with the bolt. (*Id.*)

Although "the pedestrian's knowledge of a condition is not dispositive of determining whether the thing is defective, it is appropriately considered in assessing fault." (*Id.*) Defendants argue that Plaintiff "was a regular customer of the facility who concedes her awareness of the bollards." (*Id.*)

Defendants assert that there is a minimal likelihood someone could trip over the bolt. (*Id.*) Neither the lessee nor the lessor perceived the bollards or bolts as hazardous, nor were there reports of prior injuries. (*Id.* at 15–16 (citing Doc. 115-6; Doc. 115-7).) Defendants argue the likelihood of harm factor under the risk-utility balancing test also weighs in their favor. (*Id.* at 16.)

Defendants then move to the cost of preventing harm under the risk-utility balancing test, arguing that "it would be necessary to find some alternative to bolts as a manner of securing the bollards in order for the bollards to perform their function as a vehicle barrier." (*Id.*) One possible alternative would require "drilling much larger holes through the existing cement sidewalk and anchoring much lengthier bollards in the earth below, with only the top two feet protruding above the surface." (*Id.*) Defendants ultimately dismiss this alternative due to a lack of documentation of

the cost, further alleging it would "clearly be quite substantial in comparison to the four modest holes and bolts securing the bollards in the subject installation." (*Id.*)

Defendants further explore the cost of preventing the harm by looking to the alternatives proposed by Plaintiffs experts. (*Id.*) Defendants contend the alternatives either fail to "reduce the purported hazard" or "come with price tags[.]" (*Id.*) They fail to reduce the alleged risk created by the original condition (the 1/4" change in height): first, adding a cap to the bolt would only increase the height of the complained of condition, and second, reorienting the bolt would still provide the same complained of condition, with the bolt higher than the base plate. (*Id.*) Additionally, Defendants argue the cost of preventing the harm is deprived of any weight in a risk-utility balancing test absent evidence to show the cost of preventing the harm. (*Id.*)

Defendants then turn to the final factor, asserting that patronizing Defendants' store and throwing away trash were not "inherently hazardous activities[.]" (*Id.*) Defendants do not dispute that Plaintiff's action provided "some social utility." (*Id.* at 16–17.) Despite this, Defendants argue the factor does not weigh heavily in assessing an unreasonably dangerous condition under the risk-utility balancing test. (*Id.* at 17 (citing *Farrell*, 359 So. 3d 467).)

In sum, Defendants contend that an application of the risk-utility balancing test weighs in their favor, warranting summary judgment in their favor, because the bollards were required by applicable safety regulations and installed in a manner standard within the industry. (*Id.*) Defendants argue that "no reasonable juror could find a breach of the duty owed to [Plaintiff]," pointing out that "a pedestrian would have to be uniquely inattentive to trip over the bolt which is only an inch or two from the readily[] apparent two[-]foot[-]high bollard post." (*Id.*)

Defendants also argue that the existence of a duty is determined by "whether the sidewalk was maintained in a reasonably safe condition for persons exercising ordinary care and prudence."

(*Id.* (quoting *Bufkin*, 171 So. 3d at 856).) Defendants then point to Plaintiff's actions, alleging that Plaintiff "is the only person to have reportedly fallen or sustained injury in connection with the bollards." (*Id.*) Plaintiff admits to not paying attention to the bollards, and "it is inarguable that [Plaintiff] tripped because she [was not] watching where she was going." (*Id.* (citing Doc. 115-4 at 17).)

According to Defendants, Plaintiff's expert testimony is "ineffective to defeat summary judgment" since "[n]o amount of 'expert' opinion testimony, genuine or ersatz, can overcome the fact that any person exercising ordinary care would see and avoid the bollards and their bolts." (*Id.* at 17–18.) Defendants further dispute Plaintiff's expert testimony, alleging that Plaintiff's experts rely on a "plainly wrong" premise. (*Id.* at 18.) Defendants argue the bollard, base plate, and bolts do not constitute a part of the walking surface subject to various safety codes as "[i]t is self-evident that pedestrians are not intended to walk across the 20" high bollards, [] the base plates[,] or the bolts which secure the base plates to the pavement." (*Id.*)

Defendants distinguish the cases relied upon by Plaintiff as involving "a lone, exposed bolt protruding from a walking surface" creating an unreasonably dangerous condition, whereas the present case involves "a bolt incorporated in a vertical impediment located on a walking surface" that does not create an unreasonably dangerous condition. (*Id.* citing *Allen v. Great A&P Tea Co.*, 589 So. 2d 43 (La. App. 1 Cir. 1991); *Richard v. Wal-Mart Stores, Inc.*, 29,976 (La. App. 2 Cir. 2/6/98), 702 So. 2d 79).)

Finally, Defendants contend that although it may not be possible to make a premises entirely hazard-free, obstructions "such as sign poles, fire hydrants, mailboxes, bollards and telephone poles" are not unreasonably dangerous because the items have utility and are obvious. (*Id.* at 19.) Defendants argue summary judgment is proper because an application of the risk-utility

13

balancing test should lead the Court to conclude "that no reasonable jury could find that [D]efendants breached the duty owed to [P]laintiff." (*Id.* (citing *Farrell*, 359 So. 3d 467).)

### B. *Plaintiff's Opposition* (Doc. 117)

Plaintiff cites the Louisiana Supreme Court's decision in *Farrell*, arguing that "a defendant's duty to maintain safe premises is not negated simply because a hazardous condition is visible." (*Id.* at 1 (citing *Farrell*, 359 So. 3d 467).) Plaintiff also avers that the court in *Farrell*:

> (1) emphasized that its prior jurisprudence improperly conflated the duty and breach elements of the duty-risk analysis; (2) reaffirmed that summary judgment is appropriate if reasonable minds could only conclude that the condition was not unreasonably dangerous; (3) whether a condition is unreasonably dangerous depends upon whether the defendant breached the duty to protect against the hazard; (4) made clear that the plaintiff's actual or constructive knowledge of the defect is irrelevant in determining whether the defect is unreasonably dangerous; and [(5)] recognized that the unreasonably dangerous inquiry is inherently fact-intensive and should ordinarily be resolved through a full trial.

(*Id.* (citing *Farrell*, 359 So. 3d 467) (emphasis omitted).)

Plaintiff argues a genuine issue of material fact exists regarding whether Defendants "breached their duty to protect against the alleged hazard." (*Id.* at 2.) She points to the fact that the installation of the bollards "altered the original, safe design" of the building's means of egress, violating Louisiana building codes. (*Id.*) Furthermore, Plaintiff argues "[t]he trip hazard associated with the utilization of upside-down exposed bolts to secure bollards is well known . . . [,]" because the bollard industry provides methods to make the complained of condition safer (such as bollard collars and sleeves to cover exposed bolts) or avoid the complained of condition entirely (such as thread-down or hidden bolt securement). (*Id.*)

Plaintiff argues that Defendants "failed to take reasonable and inexpensive measures to mitigate" the alleged hazard, and the "dangers associated with the placement of bollards into the

middle of the means of egress[]" were evident "by the bollards' original bright fluorescent yellow warning paint[.]" (*Id.*) Plaintiff argues Defendants could have mitigated the hazard by: "(1) covering or grinding down the exposed bolt threads; (2) installing the bolts threads-down or at safe heights; or (3) installing the bollards onto the parking lot surface." (*Id.*) Defendants increased the danger posed to patrons and customers "by placing the trash receptacle near the bollards and the exposed bolt hazard and directing pedestrians near the hazard." (*Id.*) Plaintiff points to "photographs, witness testimony, expert witness testimony, and Louisiana's mandatory building codes and safety standards," as material facts which "establish a reasonable basis for a jury to conclude that the exposed bolts in this case presented an unreasonable risk of harm." (*Id.*) Plaintiff argues summary judgment should not be granted because a genuine issue of material fact exists regarding whether Defendants breached their "duty to protect against this known trip[ping] hazard, [and] failing to take reasonable steps to eliminate, mitigate, or warn against the hazard." (*Id.*)

### 1. Unreasonably Dangerous

Plaintiff argues that reasonable minds could disagree on whether the alleged defect is unreasonably dangerous. (*Id.* at 5.) She says that the *Motion* "improperly and predominantly relies upon jurisprudence involving a duty-risk analysis in concrete expansion join cases"; moreover, Plaintiff argues the motion "misconstrues the Louisiana Supreme Court's holding in [*Farrell*]." (*Id.*) Regarding Defendants' reliance on cases involving differences in elevation between concrete expansion joints (*Id.* at 5–6 (citing *Robinson v. Pointe Coupee Par. Sch. Bd.*, No. 23-215, p. 11 (La. App. 1 Cir. 2/21/24), 2024 WL 702600, at *5 n.14; *Chambers*, 85 So. 3d at 598; *Reed*, 708 So. 3d at 366; *Prince v. Rouse's Enters., LLC*, No. 20-150 (La. App. 5 Cir. 12/2/20), 305 So. 3d 1078, 1084)), Plaintiff notes that temperature variations do not affect an exposed bolt, unlike

concrete expansion joints, and therefore Defendants' proposed bright-line elevation rule does not apply (*Id.* at 6).

Plaintiff contends that when assessing "a commercial means of egress, the reasonable person standard includes the elderly, handicapped, and mobility-impaired, not just young and perfectly healthy individuals." (*Id.*) Pointing to the opinions of her experts, Plaintiff maintains that regulations prohibit the complained of condition "where a pedestrian's attention is often directed towards many different distractions, such as signs, advertisements, products, moving vehicles, people, etc." (*Id.*)

Plaintiff argues that in *Farrell*, "the Louisiana Supreme Court repudiated the 'no duty rule' relating to open and obvious hazards[]" because the no duty determination by the courts "has confused the role of the judge and jury in the unreasonable risk of harm inquiry[.]" (*Id.* at 7 (quoting *Farrell*, 359 So. 3d at 475).) If summary judgment were to be granted, it should not be on the "inaccurate" conclusion "that a defendant generally does not have a duty to protect against an open and obvious condition"; but instead "granted upon a finding that reasonable minds could only agree that the condition was not unreasonably dangerous[.]" (*Id.* (quoting *Farrell*, 359 So. 3d at 478) (emphasis omitted).)

To rely upon an open and obvious analysis to determine if the "condition would be apparent to any reasonable person who might encounter it[]" would "resurrect[] the long ago abolished doctrines of assumption of the risk and contributory negligence." (*Id.* (quoting *Farrell*, 359 So. 3d at 478).) While Plaintiff's knowledge of the risk may result in an allocation of fault, it "is not appropriate for summary judgment proceedings." (*Id.* (citing *Farrell*, 359 So. 3d at 477 n.7).)

Defendants' argument for a bright-line rule on pavement deviations is one rebuked by Louisiana scholars and courts alike. (*Id.* at 8 (citing *Seymour v. Murphy Oil*, 24-448 (La. 6/19/24),

386 So. 3d 312).) Defendants' proposed bright-line rule does not exist because the determination of whether a condition is unreasonably dangerous is determined by evaluating the totality of the circumstances in each case. (*Id.* (citing *Chambers*, 85 So. 3d at 598).) Such a bright-line rule cannot exist "because each defect is equally unique, requiring the fact-finder to place more or less weight on different considerations depending on the specific defect under consideration." (*Id.* (quoting *Broussard v. State ex rel. Office of State Bldgs.*, 12-1238 (La. 4/5/13), 113 So. 3d 175, 191 (internal quotation omitted)).)

Plaintiff argues that ultimately, Defendants owed a duty to Plaintiff such that this Court should not grant Defendants' *Motion for Summary Judgment*. (*Id.* at 9.) Plaintiff points to the jurisprudence relied upon by Defendants as finding no breach of duty for concrete expansion joint cases, arguing that Defendants still maintained "a mandatory obligation under federal and state laws, building codes, standards, and regulations to eliminate or warn against changes in elevation exceeding one-quarter inch[.]" (*Id.* at 8–9.) Plaintiff also argues Defendants had a duty to warn of the change in elevation "particularly when located in a commercial means of egress . . . to protect the elderly, handicapped and mobility impaired[.]" (*Id.*)

Plaintiff vehemently disputes Defendants' argument that there is " 'no duty' to protect against a visible hazard[,]" saying it is an "inaccurate." (*Id.* at 9.) Plaintiff also dismisses an analysis of whether Plaintiff had "actual or constructive knowledge of the defect" as irrelevant to determining whether a condition is unreasonably dangerous. (*Id.*) Finally, Plaintiff says that Defendants are only entitled to summary judgment when "reasonable minds could only agree that the condition was not unreasonably dangerous, which ultimately requires a finding that there exists no genuine issue of material fact that the defendant did not breach the duty to protect against the hazard." (*Id.* (emphasis omitted).)

17

Plaintiff additionally urges no bright-line rule exists for finding that "an exposed bolt protruding 1 3/4 [inches] above a concrete walkway surface cannot present an unreasonable risk of harm." (*Id.* (cleaned up).) To support this point, Plaintiff cites cases finding bolts protruding from the surface at ranges from 1" to 2" as unreasonably dangerous. (*Id.* at 9–10 (citing *Great A&P Tea Co.*, 589 So. 2d 43 (citing *Sistler v. Liberty Mut. Ins. Co.*, 558 So. 2d 1106 (La. 1990); *Richard*, 702 So. 2d 79; *Moulds v. La. Stadium and Exposition Dist.*, No. 21-503 (La. App. 4 Cir. 3/23/22), 336 So. 3d 920, 924).)

In sum, Plaintiff contends:

> the courts' condoning of a 1 1/2" change in elevation in concrete expansion joint cases does not apply in an exposed and protruding bolt case. A small, exposed bolt protruding above a walkway surface presents a small and difficult to observe hazard; therefore, the defendant owes a duty to protect against this known trip hazard. The defendant must take reasonable steps to eliminate, mitigate, and/or warn of the hazard; otherwise[,] the defendant breached the duty to protect against the hazard. Where the defendant breached the duty to eliminate, mitigate, or warn, reasonable minds can conclude that the condition presented an unreasonable risk of harm.

(*Id.* at 10.)

## 2. Breach

Plaintiff argues that "[t]he presentation of expert testimony generally raises a fact question to survive summary judgment." (*Id.* at 11 (citing *Stewart v. Cap. Safety USA*, 867 F.3d 517, 521 (5th Cir. 2017)).) Plaintiff reviews the expert testimony she has presented, arguing that a genuine issue of material fact exists as to whether Defendants "breached their duty to protect against the exposed bolt trip[ping] hazard." (*Id.* at 12.) Plaintiff's expert Neal Johnson, AIA, RRO ("Johnson") opined that "[t]he premise safety element of people getting in and out, getting to the parking lo[ts] safely has to be considered in every aspect of our services." (*Id.* (quoting Doc. 117-17 at 27) (internal quotation marks omitted).) Pointing to Johnson's opinion, Plaintiff argues that "Defendants failed to meet the standard of care necessary to provide [a] reasonably safe premises

. . . ." (*Id.* quoting Doc. 117-16 at 3) (internal quotation marks omitted).) Plaintiff further points

to Johnson's opinion that "Defendants created an unreasonable risk of harm" which Defendants

"knew or should have known[]" about; "yet[,] [they] ultimately failed to make the condition safe,

or at the very least, adequately warn of such condition." (*Id.* quoting Doc. 117-16 at 3) (internal

quotation marks omitted).)

In support of Plaintiff's contention that Defendants failed to eliminate the hazard, Plaintiff

points to Defendants' failure to abide by Louisiana laws. (*Id.* at 12–13 (citing Doc. 117-16 at 10).)

Plaintiff, relying on Louisiana state laws and local ordinances, argues that Defendants' commercial

building must comply with the following standards:

> (1) applicable edition of the International Building Code, International Code
> Council, (2) ADA Standards for Accessible Design, Americans with Disability Act
> ("ADA"), (3) applicable edition of the International Existing Building Code
> ("IEBC"), and National Fire Protection Association ("NFPA") 101 Life Safety
> Code ("LSC"). Importantly, although the installation of the bollards should have
> complied with the East Feliciana Parish Code of Ordinances, Johnson never found
> a building permit or application for a building permit.

(*Id.* (citing Doc. 117-17 at 41, 46–47).) Plaintiff directs the Court's attention to Johnson's opinion

on the ADA's definition of a tripping hazard "generally does not include a change in elevation at

an expansion joint or crack in the pavement." (*Id.* (citing Doc. 117-17 at 52–53) (emphasis

omitted).) Plaintiff then directs attention to Johnson's opinion that the bollards and bolt were added

years after the building was originally designed and constructed so that "the building's original

means of egress, *i.e.*, 'the walking path at the transition of the handicapped parking lot space to

the store entrance doors', was not designed for the installation of a propane tank cage and

associated metal bollards." (*Id.* (quoting Doc. 117-16 at 8).)

Plaintiff cites to Johnson's opinion that the installation of the bollards must comply with

the East Feleciana Parish Code of Ordinances and "with all other applicable federal and state laws

and regulations, including the NFPA 101 LSC and the ADA[,]" not just with the NFPA 58 Liquefied Petroleum Gas Code. (*Id.* (citing Doc. 117-16 at 6).) "Johnson opined that the defendants (1) should have not placed the bollards into the commercial building's means of egress, (2) failed to determine whether the installation complied with the applicable codes and regulations, and (3) failed to discover and rectify the hazard." (*Id.* at 14 (citing Doc. 117-16 at 3).)

Plaintiff argues that the bollards should not have been installed in the middle of the sidewalk, pointing to ADA Accessibility Guidelines and NFPA 101 LSC regulations to argue "vertical protrusions above the walkway greater than one-quarter inch" are prohibited. (*Id.* (citing Doc. 117-16 at 3, 13; Doc. 117-17 at 111–12).) "[D]efendants failed 'to build and maintain a sidewalk that will be without an obstacle or bump that will impede, trip, or present a safety hazard for pedestrians' and 'to maintain a safe means of egress.' " (*Id.* (quoting Doc. 117-16 at 11–12).)

Plaintiff also contends that, aside from the safer alternative of installing the bollards in the parking lot, Defendants had safer methods of installing the bolt and bollards in the walkway. (*Id.* (citing Doc. 117-17).) Plaintiff proposes Defendants "could have . . . install[ed] metal bollards that did not utilize a bolt-down design[]" by "drill[ing] into the concrete . . . with a sleeve." (*Id.* (quoting Doc. 117-17 at 83) (internal quotation marks omitted).)

Plaintiff then turns to the testimony of Barnes to support her contention that a genuine issue of material fact exists regarding whether Defendants "breached their duty to eliminate the exposed bolt in question." (*Id.*)

> (1) [Plaintiff's] injury was caused by a dangerous premise condition that was not readily apparent or obvious; (2) [Defendants] failed to seek or obtain an assessment of the premises by a qualified safety professional trained to identify non-obvious premise hazards; (3) [D]efendants failed to remediate and control hazardous conditions on the premises; (4) [Defendants] failed to implement appropriate mitigation strategies for hazard controls; (5) [Defendants] knew or should have known of the hazardous condition; (6) [Defendants] failed to implement sufficient maintenance and repairs of the bollards; and (7) [Defendants] should have never

created the condition of improper and unsafe installation of crash protection by eliminating its installation in the middle of a high-traffic sidewalk.

(*Id.* at 14–15 (citing Doc. 117-18 at 6–9).)

Relying this time on Barnes's report, Plaintiff maintains that the bollards should have been installed "on the parking lot surface" because "the original sidewalk was not appropriately designed to accommodate the propane tank cage and installation of the metal bollards[.]" (*Id.* at 15 (citing Doc. 117-18 at 10).) Barnes opined "that the improper placement and location of the bollards resulted from delivery drivers' lacking training of the relevant federal and state laws, regulations, and standards . . . ." (*Id.* (citing Doc. 117-18 at 10).) Barnes did not "think that the original intent of the architect was to have a walkway disruption placed in the center or to the side of the walkway." (*Id.* (quoting Doc. 117-19 at 39) (internal quotation marks omitted).) Barnes opined that it is not the bollard that would be a tripping hazard, but instead the base plate and bolts "that are just high enough above the standard to catch someone's shoe." (*Id.* at 16 (quoting Doc. 117-19 at 37).)

Barnes testified that Defendants "produced no documents establishing that the local authority approved or permitted the installation of the bollards directly in the middle of the commercial building's means of egress . . . ." (*Id.* (citing Doc. 117-19 at 47).) Furthermore, Defendants failed to get the local fire marshal's approval so that the bollards were not a fire hazard preventing individuals from escaping the building. (*Id.* (citing Doc. 117-19 at 48).) Plaintiff concludes that a reasonable alternative Defendants could have pursued was, "[i]f they wanted to eliminate hazard altogether and produce the highest form of safety," Defendants could have moved the hazard "off of the sidewalk or the walkway[.]" (*Id.* (quoting Doc. 117-19 at 80–81) (internal quotation marks omitted).)

21

3. <u>Duty to Mitigate</u>

Plaintiff also asserts that a breach occurred by Defendants' failure to mitigate the hazard posed by the exposed bolt. (*Id.*) Johnson's opined that Defendants' failed to make any "affirmative effort to determine whether the bollards and exposed bolts presented a non-obvious trip hazard that required mitigation." (*Id.* at 17 (citing Doc. 117-16 at 6–8).) Further, Defendants could have mitigated the hazard by installing "a prefab cover over the metal base plate[,]" reducing the height of the exposed bolts by grinding the bolts down, or "placing an inexpensive cover of the metal base plate." (*Id.* at 17 (citing Doc. 117-17 at 83; Doc. 117-16 at 18).)

The hazard could also have been mitigated the hazard "by utilizing securement devices with the exposed bolts facing down versus protruding vertically upward . . . [,]" or Defendants could have adopted installation tactics similar to Texas Family Dollar stores. (*Id.* at 17–18 (citing Doc. 117-18 at 11, 17).) Plaintiff contends, relying on Barnes's opinion, that Family Dollar stores located in Louisiana as opposed to those in Texas:

> had bollards improperly installed with up-side-down mounting bolts, [all] in violation of the ANSI requirement for trip hazards in the walking surface . . . [all] in need of maintenance and remediation. . . . [T]he most appropriate mechanism to ensure the safe placement of the mounting plates would be the low-profile bolts, or actually inserting the bolts into the cement as intended by the manufacturer.

(*Id.* at 18 (quoting Doc. 117-18 at 17, 26).) Plaintiff argues that Defendants failed to mitigate the dangerous condition by not "remediat[ing the] improper design and installation," by "allow[ing] the crash protection appliances to remain as permanently mounted hazards in the middle of the walkway," all while "[knowing] their patrons would be expected to use that area[.]" (*Id.* (quoting Doc. 117-18 at 32).)

4. <u>Failure to warn</u>

Plaintiff alternatively argues a genuine issue of material fact exists as to whether Defendants breached their duty to warn of the hazard posed by the exposed bolt. (*Id.* at 19 (citing Doc. 117-16 at 14).) Plaintiff points to a standard requiring that "[a] warning shall be provided when a trip, a slip, or a mat-related hazard has been identified until appropriate corrections are made or the area is repaired." (*Id.* (quoting ANSI/ASSP A1264.1 "Reducing Missteps on Walking-Working Surfaces" § 8) (internal quotation marks omitted).) Johnson opined that Defendants did not comply with the ANSI standard by providing a warning or completing an investigation program to assist in determining a root cause of this related fall. (*Id.* (citing Doc. 117-16 at 15).) Additionally, Johnson's opined that "[t]he sidewalk condition was not in compliance with ASTM F1637 as it was not safe for walking, was substandard, and needed repair." (*Id.* (quoting Doc. 117-16 at 15) (internal quotation marks omitted).)

Plaintiff argues that since the bolts were camouflaged and rusty, the hazard was not obvious, contributing to the accident. (*Id.* (citing Doc. 117-16 at 19; Doc. 117-17 at 87, 90).) Barnes testified in his deposition that the bollard and baseplate "were originally painted bright yellow which meets the ANSI Z535 standard for communication of hazards." (*Id.* at 20 (quoting Doc. 117-19 at 42) (internal quotation marks omitted).) This indicates that at one point, the bollards were "recognized . . . [as] a potential trip[ping] hazard." (*Id.* (quoting Doc. 117-19 at 42).) But the bollard and baseplate did not maintain "its high fluorescent yellow to communicate a potential trip[ping] hazard." (*Id.* (quoting Doc. 117-19 at 56) (internal quotation marks omitted).)

Barnes also testified that the risk posed by the bolt was possibly once mitigated by a red plastic bolt cap, as evidenced by "red plastic embedded into the bolt threads." (*Id.* at 21.) "Barnes included the photographs of the faded red plastic in his expert report because someone previously

23

tried to warn pedestrians of the trip[ping] hazard associated with the exposed bolts . . . ." (*Id.* (citing Doc. 117-19 at 106).) Plaintiff argues that Defendants did not admit to placing the red plastic bolt cap because such an admission would "[prove] actual knowledge of the tripping hazard . . . ." (*Id.*) The faded red plastic is circumstantial evidence proving "at least one agent of the [Defendants] more likely than not placed [a] red plastic bolt cap[] on the very bolt in question to mitigate the tripping hazard." (*Id.*)

### 5. Knowledge

Plaintiff emphasizes that her "actual or constructive knowledge of the alleged defect is not relevant on a summary judgment determination of the unreasonably dangerous inquiry." (*Id.* at 21–22 (citing *Farrell*, 359 So. 3d at 478).) Because of this, "the fact that [Plaintiff] lived across the street or visited the Family Dollar store is not material in determining whether the condition presented an unreasonable risk of harm to the public." (*Id.* at 22.) Instead, Plaintiff argues, "[t]he relevant question is whether [Defendants] took reasonable actions to eliminate, mitigate, or warn against this tripping hazard[.]" (*Id.*) "[T]he direct and circumstantial evidence overwhelmingly establishes a genuine issue of material fact regarding [Defendants'] breach of duty to protect against the trip hazard in question." (*Id.*)

### 6. Risk-Utility Balancing Test

Plaintiff urges that reasonable minds could find an unreasonable risk of harm here through a duty-risk analysis. (*Id.*) Looking first to "the utility of the complained-of condition," Plaintiff concedes that "the crash-protection bollards served a legitimate safety purpose by protecting the propane tank cage, as required by NFPA 58 in May 2017." (*Id.* at 22–23.) Despite this, Plaintiff argues that a breach of Defendants' "duty to maintain safe premises[]" occurred when the delivery drivers made a "unilateral decision to modify the building's original safe sidewalk design []

without appropriate authority or approval . . . ." (*Id.* at 23.) The sidewalk's original design did not include, nor was it designed to include, the tank cage and bollards. (*Id.*) The location ("directly in the middle of the walkway") and method utilized for installation ("upside-down exposed bolt") are not how "crash-protection bollards are typically installed[.]" (*Id.*)

Plaintiff then turns to the second factor, "the likelihood and magnitude of harm." (*Id.*) Defendants "knew or should have known the potential for serious injury posed by protruding bolts in a pedestrian pathway." (*Id.*) Plaintiff first supports this argument by citing jurisprudence recognizing an exposed bolt as a tripping hazard. (*Id.* (citing *Allen*, 589 So. 2d 43; *Richard*, 702 So. 2d 79; *Moulds*, 336 So. 3d at 938).) The original color of the bollards (fluorescent yellow) indicate that Defendants had "awareness of the hazard that they introduced into the walkway." (*Id.*) "Expert testimony underscores that the tripping hazard was neither speculative nor remote." (*Id.*) "The bollard industry recognizes this tripping hazard, manufacturing protective bolt covers, sleeves, and bolt-down securement devices." (*Id.*) Plaintiff concludes that "the magnitude and likelihood of harm were both significant and foreseeable." (*Id.* at 23–24.)

Regarding the cost of preventing the harm, Plaintiff argues that "the minimal burden to prevent the risk of harm significantly weighs against [Defendants] on summary judgment." (*Id.* at 24.) Any number of the following factors would have been reasonable and inexpensive: first, Defendants could have installed the bollards on the parking lot; second, Defendants could have used a bolt with the threads facing down; third, Defendants could have placed "protective sleeves over the bollard bases and bolts"; fourth, Defendants could have used "plastic bolt covers to prevent bolt threads from snagging shoes"; and a fifth potential possibility, Defendants could have "maintain[ed] the bright yellow fluorescent hazard paint," instead of "allowing the base plates to become dilapidated and rusted." (*Id.*)

Plaintiff concludes her risk-utility analysis by arguing that by throwing away trash, Plaintiff did not engage in a dangerous activity at the time of injury. (*Id.*) Plaintiff points to Defendants' decision to place the trash can close to the tripping hazard, arguing that Defendants "directed [Plaintiff] . . . into proximity of the tripping hazard, thereby increasing the risk of injury rather than mitigating against it." (*Id.*)

In sum, Plaintiff argues that an application of a duty-risk analysis reveals a genuine issue of material fact as to whether Defendants "breached their respective duties to provide safe premises, making summary judgment inappropriate as a matter of law." (*Id.*) Plaintiff insists that no bright-line, mechanical rule of law exists the evaluation of this hazard. (*Id.* 24–25.) Instead, Plaintiff argues that a duty-risk analysis is a balancing test controlled by "[t]he facts and circumstances of each case[.]" (*Id.* at 25) Plaintiff contends that because "[t]he fact finder must place more or less weight on different considerations[,] . . . reasonable minds could conclude that the alleged defect presented an unreasonable risk of harm to pedestrians[,]" precluding Defendants' *Motion for Summary Judgment*. (*Id.*)

### C.  *Defendants' Reply* (Doc. 122)

Defendants repeat their original argument that the bollard is not a part of the walking surface and therefore walking surface safety standards are irrelevant. (Doc. 122 at 1.) Defendants summarize Plaintiff's argument regarding "the base of the bollard [as] intended to be walked upon" as an "innovative theory of liability." (*Id.*) "The outcome-determinative question remains whether the bollard constituted an unreasonably dangerous condition, such that the defendants could have breached a duty to keep the premises in a reasonably safe condition." (*Id.*)

Defendants dispute Plaintiff's interpretation of their open and obvious argument, asserting that Defendants did not argue they "owe[] 'no duty' to protect against an open and obvious

condition[]" because such an argument is not supported by *Farrell*. (*Id.* at 1–2 (citing *Farrell*, 359 So. 3d 467).) Defendants argue that *Farrell* places an open and obvious analysis under the factor assessing "the likelihood of harm" for a duty-risk analysis. (*Id.* at 2.) Here, the likelihood of harm is "as minimal as can be[]" because "there is no evidence of any other injuries related to the subject condition[.]" (*Id.* (citing *Farrell*, 359 So. 3d 467).)

Plaintiff misconstrued Louisiana jurisprudence on height deviations by asserting that the "rule only applies to cases involving 'expansion joints.' " (*Id.*) Defendants argue that Plaintiff's interpretation is unsupported by jurisprudence. (*Id.*) Defendants then point to Plaintiff's *Opposition* addressing *Robinson*, arguing Plaintiff invented the concrete distinction in the *Robinson* decision on height deviations. (*Id.* (citing Doc. 117 at 5–6; *Robinson*, 2024 WL 702600).)

Defendants turn to Plaintiff's interpretation of *Reed*, asserting that after the Louisiana Supreme Court recognized the "well-established rule" regarding height deviations, the court addressed a "separate issue of the utility of expansion joints[.]" (*Id.* at 3 (citing *Reed*, 708 So. 2d 362).) Defendants argue that *Chambers* can also be distinguished, as the Louisiana Supreme Court recognized a height deviation "does not generally present an unreasonable risk of harm[]" without expansion joints being at issue. (*Id.* (citing *Chambers*, 85 So. 3d 593) (internal quotation marks omitted).) Defendants contend that the same legal analysis for height deviations with expansion joints apply "to any other kind of premises condition." (*Id.*)

Plaintiff's position regarding unreasonably dangerous conditions can further be distinguished as the condition at issue here was neither a part of a walking surface, nor "small and easily overlooked." (*Id.* (citing *Allen*, 589 So. 2d 43; *Richard*, 702 So. 2d 79; *Moulds*, 336 So. 3d 920).) Defendants point to the fact that the bollards are "20 inches high" and "painted yellow,"

with "even the weathered portions clearly contrast[ing] with the lighter-colored pavement," to support their contention that the bollards "are not small and easily overlooked." (*Id.* at 3–4.) Defendants argue that in the cases relied upon by Plaintiff, "the protrusion was in a walkway, no longer served any function, and was not attached to any larger item which would alert pedestrians to the presence of an obstacle in their path." (*Id.* at 4 (citing *Allen*, 589 So. 2d 43; *Richard*, 702 So. 2d 79; *Moulds*, 336 So. 3d 920).) The current conditions "are completely different" for a duty-risk analysis. (*Id.*)

Defendants then contend that Plaintiff's claims have no factual support, requesting that the Court not consider Plaintiff's expert materials in evaluating the present motion. (*Id.* at 4 n.7 (referencing Defendants' *Daubert* motions attempting to exclude or limit the opinions of Plaintiff's experts).) Defendants point to Plaintiff's argument "regarding traces of a red substance that appears on the side of one of the bolt[.]" (*Id.* at 4.) Defendants assert this contention is entirely unsupported because Barnes failed to "explain how [the] transfer might have occurred, why a bolt cover would be red (none of the exemplar bolt covers are red), [who] may have clandestinely installed [and removed the bolt cover]," and why someone may have installed the cover. (*Id.* at 4–5.) Defendants further challenge this contention by pointing to Barnes's lack of knowledge for what the red substance is or how it got on the bolt. (*Id.* at 5 (quoting Doc. 117-19 at 105).)

Defendants also point to a recent case to establish the present case lacks a genuine issue of material fact. (*Id.* (citing *Rayburn v. Regions Fin. Corp.*, No. 22-484, 2025 WL 630654 (M.D. La. Feb. 26, 2025) (deGravelles, J.)).) Defendants direct the Court to its decision in *Rayburn* that "[w]hether a condition is not an unreasonable risk of harm by virtue of being open and obvious is a proper question for summary judgment." (*Id.* (quoting *Rayburn*, 2025 WL 630654, at *8).) Defendants contend that where *Rayburn* was left to the jury due to a genuine issue of material

28

facts, the present case before this Court does not have a genuine issue of material facts. (*Id.* (citing *Rayburn*, 2025 WL 630654).) To support this assertion, Defendants remind the Court that the bollards' condition on the day of the accident is undisputed, only one account of the unwitnessed accident is provided through Plaintiff's testimony, and there are a lack of similar accidents, established by Defendants' discovery responses and deposition testimony. (*Id.* at 5–6.) Defendants further argue that an absence of reported complaints regarding the "allegedly defective condition indicates a low risk of harm, for purposes of premises liability claims." (*Id.* at 6 (citing *Rainey v. Knight*, No. 23-133 (La. App. 1 Cir. 11/3/23), 378 So. 3d 116).)

Defendants then contend Plaintiff's "only remaining argument is" breach established through expert testimony. (*Id.*) Defendants argue that the proposed breach, as laid out by Plaintiff's experts, "has no support in the law." (*Id.*) Defendants contend that determining whether a legal duty has been violated, and whether a condition is unreasonably dangerous "are issues for this Court to decide, not [Plaintiff's] experts." (*Id.*)

Defendants conclude that their *Motion of Summary Judgment* should be granted because "[t]here is no basis for a jury to conclude that the lawfully mandated safety feature is unreasonably dangerous." (*Id.*)

## III.    STANDARD

### A.  Rule 56 Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden and must identify 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.' "

*Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted)).

However, "the movant 'need not *negate* the elements of the nonmovant's case.' " *Id.* (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc))). That is, "[a] movant for summary judgment need not set forth evidence when the nonmovant bears the burden of persuasion at trial." *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 997 (5th Cir. 2019) (citing *Celotex*, 477 U.S. at 323 ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim.") (emphasis in original)). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Id.* (citing *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002)).

If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a *genuine issue* for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted).

Ultimately, "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (cleaned up). Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the

evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (citations omitted).

**B.  Standard – Premises Liability – Louisiana Civil Code Articles 2315, 2316, and 2317.1**

The Louisiana Supreme Court recently corrected and clarified its prior jurisprudence regarding tort liability in a premises liability setting. *See Farrell*, 359 So. 3d 467.[3] The facts were simple. *Id*. at 470-71. The plaintiffs Joseph and Suzanne Farrell stopped at a Circle K for gas. While Mr. Farrell pumped gas, Mrs. Farrell took her dog for a walk. As she approached a low spot at the edge of the Circle K parking lot which had collected water, she attempted to step over the puddle of water but was unsuccessful and slipped in the water and was injured. *Id*. at 471.

In its ruling, the Court established the following principles, which are important to the resolution of the issues in this case. "Whether a claim arises in negligence under La. Civ. Code art. 2315 or in premises liability under La. Civ. Code art. 2317.1, the traditional duty/risk analysis is the same. And now, with La. Civ. Code art. 2317.1's requirement of actual or constructive knowledge of a defect, the result under either should be the same." *Farrell*, 359 So. 3d at 473.

> Under the duty/risk analysis, the plaintiff must prove five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of duty element); and, (5) proof of actual damages (the damages element)."

*Id.* (citations omitted).

---

[3] In a recent law review article, Professor Thomas Galligan heartily applauded *Farrell* for helping clarify a confusing and sometimes contradictory body of jurisprudence in this area. Thomas C. Galligan, Jr., *Continued Conflation Confusion in Louisiana Negligence Cases: Duty and Breach*, 97 Tul. L. Rev. 339, 397–402 (2023).

"The existence of a duty is a question of law. The inquiry is whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty." *Id.* (citations omitted). In a premises liability case of the kind presented in *Farrell* and in this case,

> La. Civ. Code arts. 2315, 2316, 2317, and 2317.1, are the sources of the duty owed. The general rule is that the owner or custodian of property has a duty to keep the premises in a reasonably safe condition. The owner or custodian must discover any unreasonably dangerous condition on the premises, and either correct the condition or warn potential victims of its existence.

*Id.* at 473–74.

By contrast, [w]hether there was a breach of the duty owed is a question of fact or a mixed question of law and fact." *Id.* at 474 (citation omitted).

In deciding whether there has been a breach,

> Louisiana courts apply the risk/utility balancing test [which] consider[s] . . . four pertinent factors: (1) the utility of the complained-of condition; (2) the likelihood and magnitude of harm, including the obviousness and apparentness of the condition; (3) the cost of preventing the harm; and (4) the nature of the plaintiff's activities in terms of social utility or whether the activities were dangerous by nature.

*Id.* (citations omitted).

Regarding the first prong of the risk/utility test, the "the utility of the complained-of condition," *Farrell* clarified the use of the term "complained-of condition." *Id.* In some earlier cases, courts took a broad view and looked beyond the specific injury causing condition. So for instance, in *Bufkin*, "[t]he plaintiff maintained that [the defendant construction company] was liable for his injuries because [the defendant] had negligently created an unreasonable risk of harm to pedestrians by setting up a 'blind spot' that prevented pedestrians from seeing oncoming traffic when crossing the street near [the defendant's] dumpster." *Bufkin*, 171 So. 3d at 854. The court

32

described the "complained of condition" as "[c]onducting repairs and renovations to aging French Quarter buildings" rather than creating a "blind spot." *Id.* at 856. Described as such, the court found the condition "not only desirable but necessary." *Id.*

In *Farrell*, however, the Court did not look broadly to the utility of the Circle K parking lot as a whole but rather to the specific injury-causing hazard, the "pool of water" in which Mrs. Farrell slipped. *Farrell*, 359 So. 3d at 474. In considering its utility, the *Farrell* court said, "Here, there is no evidence the pool of water was intended, nor do we otherwise find any utility to its presence in the parking lot of a commercial store." *Id.*

The second prong of the risk/utility test measures "the likelihood and magnitude of harm, including the obviousness and apparentness of the condition." *Id.* The Court stated:

> The likelihood of the harm factor asks the degree to which the condition will likely cause harm. If it is likely to cause harm, that weighs in favor of finding it unreasonably dangerous. If it is unlikely to cause harm, that weighs in favor of it not being unreasonably dangerous. The magnitude of the harm factor asks whether the condition presents a risk of great or small injury and the likelihood of each. The likelihood and magnitude of the harm, includes a consideration of the open and obviousness of the condition.

*Id.*

Contrary to what was suggested in some earlier Supreme Court and appellate cases, the Court in *Farrell* made clear

> that whether a condition is open and obvious is embraced within the breach of the duty element of the duty/risk analysis and is not a jurisprudential doctrine barring recovery, but only a factor of the risk/utility balancing test. Specifically, it falls within the ambit of the second factor of the risk/utility balancing test, which considers the likelihood and magnitude of the harm, and it is not a consideration for determining the legal question of the existence of a duty. Thus, although this Court has so stated before, it is inaccurate to profess that a defendant generally does not have a duty to protect against an open and obvious condition.

33

*Id.* at 478.

The Court stated that the test for whether a condition is open and obvious is an objective one.

> For a hazard to be considered open and obvious, it must be one that is open and obvious to all who may encounter it. The open and obvious concept asks whether the complained of condition would be apparent to any reasonable person who might encounter it. If so, that reasonable person would avoid it, and the factor will weigh in favor of finding the condition not unreasonably dangerous. Whether the plaintiff has knowledge of the condition is irrelevant in determining whether the thing is defective. Otherwise, the analysis resurrects the long ago abolished doctrines of assumption of the risk and contributory negligence, both of which focus on the knowledge and acts of the plaintiff. The plaintiff's knowledge is appropriately considered in assessing fault, but is not appropriate for summary judgment proceedings.

*Id.*[4]

Despite suggestions to the contrary in some earlier cases, *Farrell* emphasized that there is no bright-line size or height measurement to be applied in determining whether a hazard is open and obvious or unreasonably dangerous; indeed, whether a condition is unreasonably dangerous may depend, said *Farrell*, on where the condition is located.

> We note that the size of the allegedly unreasonably dangerous condition is relevant. The more obvious the risk, the less likely it is to cause injury because it will be avoided. Thus, it is conceivable that an allegedly hazardous condition, as alleged in this case, located at the entrance to the store, may ultimately be determined to be unreasonably dangerous; whereas, the same condition, located in the corner of a parking lot, may not be unreasonably dangerous because the likelihood and magnitude of harm is vastly different. It is also relevant that the pool of water was not located in a customarily traversed area, such as the entrance to the store, where patrons would likely encounter it or be forced to encounter it to go into the location.

---

[4] The Court notes that La. H.B. No. 431 (2025) reinstituted a form of contributory negligence in Louisiana, but this Act becomes effective on January 1, 2026—before the events giving rise to this suit and before this decision was rendered. Because H.B. No. 431 does not apply to this case, the Court need not address its impact on the *Farrell* standard, whatever that may be.

It also was not located near the gas pumps, where, again, it would necessarily or likely be encountered by customers.

*Id.*[5]

Although the question of breach is a mixed question of fact and law, summary judgment may nonetheless be appropriate on the issue. *Id.* at 476. "Summary judgment on the issue of an unreasonably dangerous condition is warranted upon a finding that no reasonable juror could have found that the defendant was in breach of the duty." *Id.* at 479–80.

### C. Standard – Premises Merchant's Liability – La. R.S. § 9:2800.6

La. R.S. § 9:2800.6 states in pertinent part:

A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.

B. In a negligence claim brought against a merchant by a person lawfully on the merchant's premises for damages as a result of an injury, death, or loss sustained because of a fall due to a condition existing in or on a merchant's premises, the claimant shall have the burden of proving, in addition to all other elements of his cause of action, all of the following:

(1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable.

(2) The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence.

(3) The merchant failed to exercise reasonable care. In determining reasonable care, the absence of a written or verbal uniform cleanup or safety procedure is insufficient, alone, to prove failure to exercise reasonable care.

---

[5] See also *Reed*, 708 So. 2d at 364 ("Because of the plethora of factual questions and other considerations involved, the issue necessarily must be resolved on a case-by-case basis."); *Broussard*, 113 So. 3d at 191 ("There is no bright-line rule . . . [because] each defect is equally unique, requiring the fact finder to place more or less weight on different considerations depending on the specific defect under consideration.").

La. R.S. § 9:2800.6.

In determining whether a defect creates an unreasonable risk of harm for purposes of § 9:2800.6, the same risk-utility test is used as that utilized for purposes of La. Civ. Code arts. 2315 and 2217.1, i.e., a:

> consideration of (1) the utility of the condition; (2) the likelihood and magnitude of the harm, including the obviousness of the condition; (3) the cost of preventing the harm; and (4) the social utility of plaintiff's activity.

*Gauthier v. Dollar Tree Stores, Inc*., 50,936 (La. App. 2 Cir. 10/21/16), 208 So. 3d 503, 505, *writ denied*, 16-2047 (La. 1/9/17), 214 So. 3d 869 (citing *Broussard*, 113 So. 3d 175); *see also Jones v. Arch Ins. Co*., No. 12-2029, 2013 WL 5441354, at *2 (W.D. La. Sept. 27, 2013); *Moore v. Fam. Dollar Stores, Inc.,* No. 21-03764, 2023 WL 3662706, at *2 (W.D. La. Apr. 17, 2023).

"Simply put, the trier of fact must decide whether the social value and utility of the hazard outweigh, and thus justify its potential harm to others." *Russell v. Morgan's Bestway of La., LLC*, 47,914, p. 6 (La. App. 2 Cir. 4/10/13), 113 So. 3d 448, 452.

## IV.    DISCUSSION

A more detailed review of the facts is warranted here to give context for the discussion of the risk-utility factors. Plaintiff lived near the Family Dollar store in Jackson, La., and had been to the store "many times." (Doc. 115-4 at 2–3.) As one faces the store, a Ferrellgas (Blue Rhino) propane kiosk was located on the walkway immediately adjacent to the front of the store and was near to and to the left of the store's two entrance/exit doors. (Photograph, Doc. 79-2 at 24.)[6]

---

[6] This photograph from Neal Johnson's report is a frontal view of the Family Dollar store which shows a portion of the parking lot, the two doors leading in and out of the store and the Ferrellgas kiosk. However, it is taken from Google Maps and does not show the garbage can, and the location of the kiosk seems to be different from the position as shown in photos taken by family members shortly after the accident. It appears that photographs, Docs. 115-4 at 19, 21, and 22 were taken my members of Plaintiff's family on the date of the accident, whereas photographs, Docs. 115-4 at 18 and 20 were taken by Family Dollar at another time. (Doc. 115-4 at 10–12.)



On the date of the accident, there was a garbage container also located on the sidewalk a short distance from and, as one faces it, to the left of the propane kiosk. (Photographs, Doc. 115-4 at 18, 20.)





According to Plaintiff, on the date of the accident, she parked her car in the parking lot of the Family Dollar Store, entered the store and bought motor oil. (Doc. 117-21 at 2.) She left the store and dispensed the oil in her vehicle's crankcase. (*Id.*) She then proceeded to the trash receptacle or trash can located at the front of the store and to the left of the propane kiosk where she dropped the empty can(s) into the garbage container. "[A]nd [when] I turned to go to my car, a bolt caught my tennis shoe and caused me to lose my balance and I fell face down . . . ." (Doc. 115-4 at 6.) Her shoe struck the bolt with sufficient force that it punctured the canvas of the shoe. (*Id.* at 10.)

While Plaintiff saw the bollards as she approached the garbage container, she "never s[aw] the screws . . . ." (*Id.* at 14.) When asked whether she "notice[d] the bolts" as she approached the garbage can, she stated, "No, I did not the way I was going to the garbage can." (*Id.* at 16.) When asked whether "there [was] anything on the bollard or near the bollard that was obstructing your view of the bolts," she answered that there was "trash at the can." (*Id.* at 17.)

Plaintiff was asked what she was looking at after she turned back toward her car after placing the trash in the can. She answered, "When I turned to go to my car, my car" (*Id.* at 16), which the Court interprets to mean that when she turned around after placing trash in the receptacle, she looked towards her car.

*Utility of Complained-of-Condition*

How one measures the first factor—the utility of the complained-of condition—depends on how one describes "the complained-of condition." As explained above, *Farrell* made clear that the Court must focus not on the broad context in which the injury-producing instrumentality existed (e.g., the parking lot where puddle of water was located was located), but rather the injury-producing instrumentality itself (in the case of *Farrell*, the water puddle at the edge of the parking lot).

In this case, there are at least two conditions about which Plaintiff complains: the placement of the bollards on the sidewalk rather than in the parking lot adjacent. (*See, e.g.*, Doc. 117 at 14 ("[D]efendants . . . should have not placed the bollards into the commercial building's means of egress . . . ."); *see also id.* at 15.) But Plaintiff also complains about the size and location of the specific bolt that she tripped on. (*Id.* at 14 (record citations omitted) ("[T]he exposed bolts exceeded the ADAAAG regulations and NFPA 101 LSC regulations, both prohibiting vertical protrusions above the walkway greater than one-quarter inch (1/4")."); *see also id.* at 16–19).)

The bollards themselves clearly had utility in that they served the important purpose of protecting the propane tanks from possible damage from an automobile, although Plaintiff is arguing, at least in part, that it is the location of the bollards on the sidewalk rather than the edge of the parking lot, that made them a hazard. But, following *Farrell*'s lead, the Court must also look to the other complained-of condition: the bolt on which Plaintiff tripped. Clearly the bolt also had some utility in that it helped secure one of the bollards to the concrete walkway. But Plaintiff's

experts argue that the utility of the bollards' fasteners could have been equally and more safely served without any exposed bolt at all. (*See, e.g.* photographs, Doc. 79-2 at 31–32; *see also* Doc. 117 at 17 (summarizing Johnson's testimony regarding the use of a prefab cover for the metal base plate, grinding the bolts down to reduce the height of the bolt, or using an inexpensive cover over the metal base plate).) Therefore, while Defendants obviously disagree with Plaintiff's experts on these points, there is record evidence that the bolt served little if any utility. On balance, this factor favors Defendants, although there is an issue of fact as to the degree of utility served by the subject bolt.

*The Likelihood and Magnitude of Harm, Including the Obviousness and Apparentness of the Condition*

The Court first addresses two threshold arguments made by Defendants in connection with this second prong of the risk-utility test: first, Defendants assert that "[i]t is established Louisiana law that a defendant does not have a duty to protect against that which is 'obvious and apparent.' " (Doc. 115-1 at 8 (citing *MacArthur,* 2022 WL 5140951, at *1)); second, they argue that "the allegedly dangerous conditions on which Plaintiff's claims are based (i.e., the bollards and the bolts) have been found not to be unreasonably dangerous . . . [because] 'Louisiana courts have repeatedly held that elevations of up to two inches do not present an unreasonable risk of harm.' " (*Id.* at 3, 5 (quoting *Lacaze*, 2022 WL 4227240, at *4).) In briefing on its *Daubert* motion, Family Dollar stated their position even more categorically: "[T]he law is that a height difference of 3/4 – 1 3/4" is not an unreasonable risk of harm." (Doc. 101 at 4.)

The Court disagrees with both of Defendants' propositions. Regarding Defendants' first argument, *Farrell* made clear that "whether a condition is open and obvious is embraced within the breach of the duty element of the duty/risk analysis and is not a jurisprudential doctrine barring recovery, but only a factor of the risk/utility balancing test. . . . [I]t is inaccurate to profess that a

40

defendant generally does not have a duty to protect against an open an obvious condition." *Farrell*, 359 So. 3d at 478. "Whether there was a breach of the duty owed is a question of fact or a mixed question of law and fact." *Id.* at 474 (citation omitted). While summary judgment may be appropriate on the question of whether there was a breach, it is only "warranted upon a finding that no reasonable juror could have found that the defendant was in breach of the duty." *Id.* at 479–80.

Contrary to Defendants' second argument, there is no bright-line size or height that governs whether an obstacle is or is not unreasonably dangerous. While the "size of the allegedly unreasonably dangerous condition is relevant[,] . . . it is conceivable that an allegedly hazardous condition, as alleged in this case, located at the entrance to the store, may ultimately be determined to be unreasonably dangerous; whereas, the same condition, located in the corner of a parking lot, may not be unreasonably dangerous because the likelihood and magnitude of harm is vastly different." *Id.* at 474.

Defendants' reliance on this Court's decision in *Lacaze* is also misplaced. While this Court wrote that "Louisiana courts have repeatedly held that elevations of up to two inches do not present an unreasonable risk of harm[,]" *Lacaze*, 2022 WL 4227240, at *4, Defendants fail to quote this important qualification of the Court's opinion: "The Court stresses that the height of the elevation is only one factor of the four-part test, and it is certainly possible that a height differential of 1-1/2 inches or less might, in a different setting, pose an unreasonable risk of harm." *Id.* at *7 n.4.[7]

Furthermore, *Lacaze* and the cases it relied on dealt with differences in elevation on the surfaces of parking lots and sidewalks which present very different considerations than those presented in this case. As stated in *Lacaze*,

---

[7] In this case, the bolt in question was one-and-three-quarters (1 3/4") above the surface of the sidewalk. (Doc. 79-2 at 8, 29.)

[t]he court in *Buchanan* noted more generally that "[i]t is common for the surfaces of streets, sidewalks, and parking lots to be irregular." *Reed*, 708 So. 2d at 363. "It is not the duty of the party having garde of the same to eliminate all variations in elevations existing along the countless cracks, seams, joints, and curbs. These surfaces are not required to be smooth and lacking in deviations. . . ." *Buchanan*, 834 F. App'x at 63 (quoting *Reed*, 708 So. 2d at 363).

*Id.* at *7.

The same is not true regarding the intentional (or even unintentional) placement of a potential tripping hazard in an area inside or outside the store where store's operator should reasonably expect regular customer foot traffic. *Farrell*, 359 So. 3d at 474–75. For instance, in *Cali v. Cracker Barrel Old Country Store, Inc.*, the plaintiff alleged that "she was walking up to the porch of the Cracker Barrel when she tripped and fell over the bottom section of a rocking chair that was in her path." No. 16-167, 2016 WL 6947001 (E.D. La. Nov. 28, 2016), at *1. In denying summary judgment, the Court stated,

> In this case, the Court finds that Plaintiff has made a sufficient showing that the rocking chair presented an unreasonable and reasonably foreseeable risk of harm to survive a motion for summary judgment. Defendant argues that the chair was open and obvious, and was therefore not unreasonable, however, at a minimum, this issue raises a question of material fact. Plaintiff alleges she could not see the chair as she was walking up the pathway to the restaurant, because the chair was somewhat hidden behind a column. An obstacle that "protrudes outward near ground level is not—at least as a matter of law—an "open and obvious" hazard. *Ray v. Stage Stores, Inc.*, 640 Fed.Appx. 322, 324–25 (5th Cir. 2016).

*Id.* at *4.

The complained-of condition in this case, similar to that in *Cali*, involved an obstacle which protruded upward and was near ground level.

Regarding the likelihood and magnitude of potential harm, there is an abundance of evidence in the record in the form of testimony from Plaintiff's two experts that the bolt was a tripping hazard that violated various governmental and industry standards. (*See, e.g.*, Doc. 79-2 at 15; Doc. 79-3 at 24–31.) Expert Neal Johson opined specifically that "[a] high probability exists

that the defective sidewalk condition may, as documented in this report, result in severe injuries." (Doc. 79-2 at 18.) There is additional expert opinion supporting Plaintiff's position that the bolt was not open and obvious. Neal Johnson wrote in his expert report that the bolt itself was "non-obvious as the lack of maintenance and the camouflaged nature of the bolts and rust all contributed to the accident." (Doc. 79-2 at 19; *see also* photographs, Doc. 115-4 at 18–22; Doc. 79-2 at 25–27, 29.)

Defendants hotly dispute these contentions pointing to, among other things, what they see as the open and obvious nature of the hazard and that the store owner and lessee were unaware of any prior accidents at that location. (*See, e.g.*, Doc. 115-1 at 15–16.) In any event, this is certainly a material issue of fact. Indeed, the foregoing expert testimony, by itself, raises a question of fact mandating the denial of summary judgment.

> Louisiana courts have considered whether a condition is apparent, and therefore whether it is unreasonably dangerous, to be a question of fact. Cashman has produced at least some evidence, in the testimony of its expert Mitchell Wood, that the step was not sufficiently "open and obvious" to someone walking into the restaurant and therefore could present an unreasonable risk. Courts have denied summary judgment in similar situations where there is expert testimony suggesting a condition is unreasonably dangerous. The Court acknowledges that Plaintiff's evidence is thin, particularly given the fact that the step can be viewed plainly in front of the restaurant. But because the Court must "refrain from making credibility determinations or weighing the evidence," this question of fact is reserved for the jury.

*Cashman v. Mr. B.'s Bistro, Inc.*, No. 20-645, 2021 WL 53311, at *2 (E.D. La. Jan. 6, 2021) (citations omitted).

There is additional record evidence raising material questions of fact regarding whether the obstacle was open and obvious. For instance, it is significant that the bollards and bolts were placed near the two entrance/exit doors at the front of the store, near a kiosk where the store's propane product was sold, and near a garbage can placed there for customer use. These items were

obviously placed on the sidewalk at the front of the store intentionally, presumably with the hope and expectation that these would be used by customers. The obstacle was therefore near where regular customer foot traffic would take place.

As *Farrell* instructed, the location of the allegedly hazardous condition near the front of the store is a relevant consideration in determining whether the condition presented an unreasonable risk of harm. *Farrell*, 359 So. 3d at 474–75. It is also relevant that the bolts were placed in a location where merchandise was displayed (the propane kiosk) potentially distracting a customer from the bolts protruding upward from the ground.

In *Moore v. Family Dollar Stores, Inc*., the plaintiff alleged that she "tripped over an iron rod approximately three feet in length and two inches in width" which was partially obscured by clothes "strewn about the aisle." 2023 WL 3662706, at *1. In denying summary judgment, the court wrote, "In considering whether a hazard is 'open and obvious,' both state and federal courts applying the Merchant Liability Act have denied summary judgment where a momentarily distracted plaintiff trips over a low-lying obstacle." *Id.* at *3 (citations omitted). The court also cited *Bastian v. Rosenthal*, 2017-0284, pp. 10–11 (La. App. 4 Cir. 12/20/17), 234 So. 3d 1022, 1028, for the proposition that "factual discrepancies bearing upon whether a hazard is 'open and obvious' should ordinarily be reserved for the finder of fact." *Moore*, 2023 WL 3662706, at *3.

In *Sevilla v. Kirkland's, Inc*., the plaintiff tripped over a "a flat cart is a cart that is four (4) feet long, two (2) feet wide, and nine (9) inches off the ground with a thirty-two (32) inch silver handle extending vertically from its base" which had been placed in front of a display case. No. 21-1524, 2022 WL 293251, at *1 (E.D. La. Feb. 1, 2022). Despite the defendant's understandable argument that the flat cart was open and obvious, the Court wrote

> Moreover, "[t]rip and fall cases in which courts have denied summary judgment
> generally involve customers tripping on objects located on the floor or low to the

44

ground." *Glenn v. Fam. Dollar Stores of La., Inc.*, No. CV 18-0041, 2018 WL 5260044, at *4 (W.D. La. Oct. 22, 2018). In coming to this conclusion, courts have reasoned that " 'a shopper's attention is usually directed to merchandise, not the floor[, and] [a]s a result, '[s]omething on the floor which may cause a shopper to trip and fall when her attention is directed toward her purchases is a hazard.' " *Id.* (quoting *Broussard v. Fam. Dollar Store*, 918 So. 2d 1148, 1151 (La. Ct. App. 3 Cir. 2005)) (alterations in original).

*Id.* at *2.

As stated earlier, the test for whether a hazard is open and obvious is an objective one. *See Farrell*, 359 So. 3d at 478 ("For a hazard to be considered open and obvious, it must be one that is open and obvious to all who may encounter it. The open and obvious concept asks whether the complained of condition would be apparent to any reasonable person who might encounter it."). But Ms. Stewart's testimony is nonetheless relevant on this issue. She testified that she did not see the bolt as she approached the trash can from whatever route she took. (Doc. 115-4 at 16 ("I did not [notice the bolts] the way I was going to the garbage can.").) She testified there was "trash at the can" that may have "obstruct[ed] the view of the bolts." (*Id.* at 17.)

According to Ms. Stewart, once she put the trash in the can and turned to return to her car, she was not looking at the ground directly in front of her, but rather was looking at her car. (*Id.* at 16.) There is record expert testimony that "[p]edestrians typically scan ahead in the direction of their travel, not directly down at their own feet." (Doc. 79-2 at 16.) Thus, a reasonable inference can be drawn from this record evidence (and a reasonable jury could so conclude) that the bolt would not have been open and obvious to a reasonable shopper because the shopper's eyes may have been focused on the trash on the ground and/or because the shopper, after turning to return to her car, would not have been looking down at her feet (and the bolt) but at her car.

In addition, having placed the propane kiosk on the front sidewalk near the store's entrances/exits, and then placed a garbage can near the kiosk, it is certainly reasonable to believe

that Family Dollar expected (if not encouraged and hoped for) its customers to walk in front of, view, and shop for propane at the kiosk. Family Dollar would certainly have expected customers to put trash in the can placed there for that purpose by Family Dollar. Thus, a reasonable jury could conclude that the bolt would not have been open and obvious to a reasonable shopper because that shopper may have had her attention focused the contents of the propane kiosk or the trash receptacle into which she intended to place trash.

These are material issues of fact which preclude summary judgment.

*The Cost of Preventing the Harm*

Defendants argue that "[t]he various alternatives proposed by Stewart's expert witnesses either don't come with price tags or don't reduce the purported hazard presented by the height of the bolt. . . . The lack of evidence of the cost of preventing the harm deprives the factor of any weight in the risk/utility balancing test." (Doc. 115-1 at 16 (with no citation of authority).) Plaintiff's expert, architect Neal Johnson writes in his report, "[A]s to the cost necessary to correct an unreasonably dangerous condition[,] . . . removing and replacing the bollard in a drilled hole (Photo 9 [Doc. 79-2 at 32]) within the sidewalk or placing a cover over properly placed anchor fasteners (Photo 9 [Doc. 79-2 at 31]) would be inexpensive and likely could be done in-house by maintenance personnel or local maintenance companies." (Doc. 79-2 at 18.)

The Court has reviewed the Johnson's report and particularly the language quoted above along with the referenced photograph and finds that, while there is no specific "price tag" provided, it appears that the cost of correction would be modest. At the very least, a reasonable jury could so conclude. This is a disputed fact but the Court finds that this factor weighs in favor of Plaintiff.

*The Nature of the Plaintiff's Activities in Terms of Social Utility or Whether the Activities Were Dangerous by Nature*

The Court finds that Plaintiff's activities at the time of the accident (utilizing the sidewalk to throw trash in the trash bin located thereon) had social utility and was not a dangerous activity. Defendants do not dispute this. Therefore, this factor favors Plaintiff.

*Summary*

In summary, of the four factors, one favors Defendants, two favor Plaintiff, and one is rife with questions of fact best left for a jury's consideration. Defendant's Motion for Summary Judgment will be denied.

## V.    CONCLUSION

Accordingly,

**IT IS ORDERED** that *Defendants' Joint Motion for Summary Judgment* (Doc. 115) filed by defendants Family Dollar, Inc., Family Dollar Stores of Louisiana, LLC, Southern Development of Mississippi, Inc., and Ferrellgas, LP d/b/a Blue Rhino is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>September 26, 2025</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**